UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

------------------------------------------------------x
MARIETTA BRENNER, as the natural :
tutrix and/or next of friend of E.B., :
 : CASE NO.:
 :
    Plaintiff, :
 : Judge:
vs. :
 :
 : Magistrate:
 :
SHREVEPORT SCHOOL OF :
PROGRESSIVE EDUCATION, :
 :
    Defendant. :
------------------------------------------------------x

# COMPLAINT

B<small>IZER</small> & D<small>E</small>R<small>EUS</small>, LLC
Andrew D. Bizer (LA # 30396)
andrew@bizerlaw.com
Garret S. DeReus (LA # 35105)
gdereus@bizerlaw.com
Emily A. Westermeier (LA # 36294)
ewest@bizerlaw.com
3319 St. Claude Ave.
New Orleans, LA 70117
T: 504-619-9999; F: 504-948-9996

***AND***

LAW OFFICE OF WILLIAM MOST, LLC
William Most (LA # 36914)
williammost@gmail.com
201 St. Charles Ave., Ste. 114 #101
New Orleans, LA 70170
T: 650- 465-5023

*Attorneys for Plaintiff*

This case is about how the Shreveport School of Progressive Education currently refuses to allow a student with a disability to bring her service dog to school, on the theory that the service dog might spread COVID-19. This is discrimination barred by federal and state law in part because the school permits attendance of a group far more likely to transmit COVID-19: children.

Plaintiff, MS. MARIETTE BRENNER, as the natural tutrix and/or next of friend of E.B., by and through her undersigned counsel, hereby files this Complaint and sues SHREVEPORT SCHOOL OF PROGRESSIVE EDUCATION (hereinafter "DEFENDANT"), for injunctive relief and attorneys' fees/ costs pursuant to Title III of the Americans with Disabilities Act, 42 U.S.C. § 12182 *et. seq.*; the Louisiana Human Rights Act, La. R.S. § 46:1951 *et seq.* ("LHRA"); and the Louisiana White Cane Law, La. R.S. § 46:1951, *et seq.* ("LWCL"). Further, on behalf of E.B., Plaintiff seeks compensatory / economic damages and nominal damages under the LHRA and the LWCL. With regards to Plaintiff's request for nominal damages, it is Plaintiff's position that an award of nominal damages would confer significant civil rights to the public, as a judgment in Plaintiff's favor against Defendant, regardless of the amount, would deter Defendant from discriminating against individuals with disabilities who rely on service animals in the future. Accordingly, Ms. Brenner alleges:

## JURISDICTION AND PARTIES

1. This is an action for injunctive relief and attorneys' fees / costs pursuant to Title III of the Americans with Disabilities Act, 42 U.S.C. § 12182 and its implementing regulations.
2. This Court is vested with original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.
3. This is also an action for damages pursuant to the LHRL and the LWCL.
4. This Court is vested with supplemental jurisdiction pursuant to 28 U.S.C. § 1367 as the

facts which give rise to Plaintiff's ADA claim also give rise to Plaintiff's state-law claims.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

6. Plaintiff, MS. MARIETTE BRENNER, is a resident of Caddo Parish, Louisiana.

7. Plaintiff, MS. BRENNER, is of the age of majority.

8. MS. BRENNER sues as the natural tutrix and/or next of friend of E.B., her daughter.

9. E.B. is a minor. E.B. is starting the Fifth Grade.

10. E.B. is a qualified individual with a disability pursuant to the ADA, as defined by 42 U.S.C. § 12102.

11. E.B. a Type 1 diabetic.

12. Under the regulations for Title III of the ADA, diabetes is a physical impairment. *See* 28 C.F.R. § 36.105(b)(2).

13. Moreover, under the regulations for Title III of the ADA, there are certain "predictable assessments," that is, physical impairments that predictably make an individual a qualified individual with a disability. One of these predictable assessments is that "Diabetes substantially limits endocrine function[.]" *See* 28 C.F.R. § 36.105(d)(2)(iii)(H).

14. Due to her disability, E.B. has substantially limited endocrine function. To deal with and manage her disability, on August 21, 2020, MS. BRENNER obtained a service animal for E.B.

15. E.B.'s service animal is individually trained to perform tasks for E.B., within the meaning of 28 C.F.R. § 36.104.

16. E.B.'s service animal was specifically trained by Diabetic Alert Dogs of America, out of

Las Vegas, Nevada.

17. To obtain E.B.'s service animal, MS. BRENNER had to apply and be approved by the Diabetic Alert Dogs of America, which conducted an evaluation of E.B.'s need for a service animal.

18. Specifically, E.B.'s service animal is a dog that has been individually trained to assist E.B. by detecting E.B.'s blood sugar levels and to alert E.B. when her blood sugar is either too high or too low.

19. Diabetic service dogs are particularly important for children, who are less able than adults to self-identify the behavioral and cognitive changes like hunger, irritability, or confusion that indicate a hypoglycemic event (when the child's blood sugar is too low).

20. Hypoglycemic events can lead to seizure, loss of consciousness, and death.[1]

21. Upon information and belief, DEFENDANT is non-profit corporation organized in the State of Louisiana and having the domicile of 1100 Southfield Road, Shreveport, Louisiana 71106.

22. Upon information and belief, DEFENDANT is the owner and operator of Southfield School, which is a private school located at 1100 Southfield Rd, Shreveport, Louisiana 71106.

23. All events giving rise to this lawsuit occurred in the Western District of Louisiana, Caddo Parish, Louisiana.

---

1 https://www.mayoclinic.org/diseases-conditions/hypoglycemia/symptoms-causes/syc-20373685 (last accessed 2020/9/17).

## **FACTUAL STATEMENT**

24. MS. BRENNER repeats and realleges all preceding paragraphs in support of this claim.

25. E.B. is a type I diabetic and lives in Shreveport, Louisiana.

26. E.B. and her family waited over a year to acquire a diabetic alert service dog to aid E.B. in the management of her disability.

27. Unlike individual who simply purchase an online certificate and call their pet a "service dog," E.B.'s family sought to obtain a dog that performs a task for E.B., namely, detecting E.B.'s blood sugar levels and to alert E.B. when her blood sugar is either too high or too low.

28. Obtaining a certified and trained service animal is not easy and required extensive background checks and a waiting period due to demand for trained service dogs exceeding the supply.

29. After the long wait, E.B. and her service dog "Waffles" were finally united on August 21, 2020.

30. Prior to this, MS. BRENNER had enrolled E.B. at a private school, Southfield School, where classes began on August 10, 2020.

31. Despite the ongoing COVID-19 pandemic, Southfield School—like many other institutions and facilities—has decided to resume in person activities.

32. It is widely understood that schools and environments with children are especially difficult to maintain strict quarantine and social distance due to the large gathering of people, the lack of attention span of children, and the inability of adults to constantly supervise all

children.

33. Upon information and belief, there have been numerous instances within Southfield School where children have been within six feet of each other, where individuals have not worn masks, and where all facilities have not been immediately sanitized after each contact by a child.

34. Further, even where masks are worn, many masks are made of cloth and do not have the ability to stop the spread of the virus to the same degree as an N-95 mask.

35. Quite simply, there is substantial potential for child to child transferring of COVID-19.

36. Luckily, however, the risk of a child dying from COVID-19 is extremely low. In fact, according to CDC data deaths of people under 21 accounted for just .08% of all Covid-19 deaths in the country through July.[2]

37. Moreover, the fact that there is some minute risk does not mean that all human activity has to stop. Instead, in the United States an estimated 30 million children and teens participate in organized sports per year and 3.5 million injuries occur, including an estimated 775,000 who seek treatment at a hospital.[3]

38. Thus, in deciding whether to permit an activity, the question is not whether there is risk—the question is whether the risk is unreasonable.

39. Prior to E.B.'s enrollment, in July of 2020, MS. BRENNER advised the head of the school, Mr. Justin Smith, that E.B. would ultimately need to bring her service animal to school.

---

[2] https://www.cdc.gov/mmwr/volumes/69/wr/mm6937e4.htm?s_cid=mm6937e4_w (last accessed 2020/9/16).
[3] https://www.stanfordchildrens.org/en/topic/default?id=sports-injury-statistics-90-P02787 (last accessed 2020/9/16).

40. Upon being advised of E.B.'s need for a service animal, Mr. Smith told Ms. Brenner that E.B.'s service animal would not be permitted onto the school facility.

41. In advising that E.B. would not be permitted to bring her service animal, Mr. Smith cited "COVID-19" as the basis for his denial of the request.

42. According to Mr. Smith, he was concerned that Waffles could, theoretically, be infected with COVID-19 and then, theoretically, Waffles could transmit COVID-19 to students at Southfield.

43. According to the scientific data, while dogs can theoretically contract COVID-19 "these infections are not a driver of the COVID-19 pandemic[.]"[4]

44. Moreover, the same research reveals that "There is no evidence that companion animals are playing an epidemiological role in the spread of human infections with SARS-CoV-2."[5]

45. On the CDC's website, it points out that "it appears that the virus can spread from people to animals in some situations."[6] The original transmission of the virus is believed to have come from a bat at a wet market in China.

46. However, the CDC's webpage that states there is the hypothetical possibility of animal to human transmission provide context for this risk by linking to the website for the World Organization for Animal Health, which says that there is no evidence that companion

---

[4] https://www.oie.int/en/scientific-expertise/specific-information-and-recommendations/questions-and-answers-on-2019novel-coronavirus/ (last accessed 2020/9/16).
[5] *Id*.
[6] https://www.cdc.gov/coronavirus/2019-ncov/animals/service-therapy-animals.html (last accessed 2020/9/16).

        animals are playing an epidemiological role in the spread of human infections with SARS-CoV-2. Instead, the possibility of animal-to-human spread is more pronounced on "mink farms."[7] Obviously, Southfield School is not a mink farm.

47. At no point on its webpages does the CDC state that there is a risk, much less a substantial risk, of a service animal contracting COVID-19 and transmitting it to another person.

48. On a separate page, the CDC states that "Based on the limited information available to date, the risk of animals spreading COVID-19 to people is considered to be low."[8]

49. Far from warning about a risk of service animal COVID-19 transmission, the CDC's website says that "In accordance with the Americans with Disabilities, service animals must be permitted to remain with their handlers."[9]

50. In response to Mr. Smith's purported concern about the potential for Waffles to become infected with COVID-19 and spread it to other students, on July 27, 2020, Ms. Brenner wrote a lengthy letter to explaining the low risk of dog-to-human transmission of COVID-19, citing the CDC webpage, and requesting a reasonable accommodation in the form of permitting E.B. to bring her service animal to Southfield.

51. In her correspondence, Ms. Brenner advised Mr. Smith of Southfield's legal obligation under the ADA to permit E.B. to bring her service animal to Southfield.

52. Additionally, Ms. Brenner also pointed out the following:

    First of all, please understand that [E.B.]'s classmates, teachers, and all

---

7 https://www.oie.int/en/scientific-expertise/specific-information-and-recommendations/questions-and-answers-on-2019novel-coronavirus/ (last accessed 2020/9/16).
8 https://www.cdc.gov/coronavirus/2019-ncov/faq.html#Pets-and-Animals (last accessed 2020/9/16).
9 https://www.cdc.gov/coronavirus/2019-ncov/animals/service-therapy-animals.html (last accessed 2020/9/16).

    individuals present during school will not be permitted to pet [E.B.]'s service dog, so there is no risk of breaking social distancing protocols. Service dogs are working animals, and cannot be distracted from their work by anyone (other than the owner) approaching them, engaging them, petting them, or otherwise socializing with them. This will require some education on the part of students and school personnel. When Waffles and her trainer come to Shreveport to deliver her to [E.B.], we intend for the trainer to come to school (with your permission) and meet with [E.B.]'s classmates and teacher to educate them on her role and why they are not permitted to pet her, among other things. In the event this isn't possible, I will gladly come into the classroom and accomplish the same thing. Waffles will spend her time in the classroom under [E.B.]'s desk and will not be a distraction to what transpires there.

53. After a week of unexplained delay, Mr. Smith finally responded. In his email, Mr. Smith stated that:

    "Under the circumstances, Southfield will not be able to host a service dog. Although the CDC states, "Based on the limited information available to date, the risk of animals spreading COVID-19 to people is considered to be low," there is still a risk, thus it would not be fair to ask other Southfield students and faculty to assume that risk. Even utilizing the CDC's recommendation for accommodating a service dog, the risk is still present.

    If definitive scientific evidence emerges proving there is zero risk for people to contract COVID-19 from dogs, Southfield will be more than willing to accommodate Waffles."

54. The "risk" that Mr. Smith referenced in his letter on the CDC webpage is not a risk of service animal to human transmission but is actually a reference to the risk of transmission of COVID-19 from animals to humans on "mink farms."

55. Even though she would have been fully within her rights to immediately file suit, Ms. Brenner continued to attempt to resolve this issue without court involvement through informal advocacy.

56. Further, in looking at the CDC website, Mr. Smith directly read the government page which says that "In accordance with the Americans with Disabilities, service animals must be

permitted to remain with their handlers."[10]

57. At no point did Mr. Smith explain how the purported "risk" of Waffles contracting COVID-19 and transferring COVID-19 to other students was significantly higher than the risk of student to student transfer of COVID-19.

58. Mr. Smith provided no such explanation because the "risk" of Waffles contracting COVID-19 and transferring COVID-19 to other students is infinitesimally small.

59. Moreover, to the extent there is any marginal risk, the presence of Waffles was not a "significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures."

60. Under the ADA, the only basis that Southfield could have to exclude E.B. based on her service animal was if the service animal was "a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures…"

61. As a threshold matter, Waffles was not a <u>significant risk</u> to the health or safety of others. As alleged earlier, there is no evidence that companion animals are playing an epidemiological role in the spread of human infections with SARS-CoV-2.

62. Further, classmates, teachers, and all individuals present during school will not be permitted to pet E.B.'s service animal. As such, there is no meaningful or material risk.

63. Moreover, to the extent there is any infinitesimally small risk, that risk is not larger than the possibility of student-to-student transmission, teacher-to-student transmission, or

---

10 https://www.cdc.gov/coronavirus/2019-ncov/animals/service-therapy-animals.html (last accessed 2020/9/16).

surface-to-student transmission.

64. On September 2, 2020, in a further attempt to convince Mr. Smith to permit E.B. to bring her service animal to Southfield, Ms. Brenner had a phone conversation with Mr. Smith.

65. During said phone call, Ms. Brenner emphasized again the importance of E.B. being permitted to bring her service animal to Southfield and she emphasized the nominal or non-existent risk of alleged service animal to human transmission of COVID-19.

66. During the conversation, Mr. Smith advised that his concern stemmed not just from COVID-19, but also from "the change in day routines for the students/faculty."

67. Mr. Smith again rejected Ms. Brenner's request for reasonable accommodation/modification on behalf of E.B.

68. Of course, the mere possibility that "routines" might have to be modified slightly because of a service animal is not a legal basis to exclude a service animal.

69. Continuing to hope that the situation could be resolved amicably, Ms. Brenner further explaining that the risk was nominal or not existent because "As I stated earlier, 'Waffles' is only in direct contact with members of our household and we are carefully monitoring ourselves for any signs/symptoms and potential exposures."

70. Mr. Smith failed to respond to this email. Mr. Smith's failure to respond constituted constructive denial of Ms. Brenner's request for reasonable accommodation / modification.

71. To date, E.B. has been unable to bring her service animal to Southfield.

72. Ms. Brenner's request E.B. to be permitted to bring her service animal was mandatory

under the ADA.[11] Moreover, the only three exceptions—the animal being "out of control," the animal not being housebroken, and the "direct threat" defense—are wholly inapplicable.

73. Without consistent access to her service animal, E.B. is at risk of significant injury and even death from a diabetic coma.

74. Without consistent access to her service animal, E.B.'s service animal is at risk of regression.

75. Without consistent access to her service animal, E.B. is worried about her disability and the possibility of injury. As a result, E.B. is unable to focus on her studies and education to the same degree as non-disabled students.

76. As a result of Defendant's actions and failure to accommodate, E.B. has and is continuing to suffer the following damages:

- Mental and emotional distress and anxiety;
- Reduced educational opportunities;
- Potential regression of her service animal;
- Invasion of her civil rights.

77. E.B. actively needs to bring her service animal to Southfield. In the absence of injunctive relief, Ms. Brenner possess no means of forcing or compelling Defendant to comply with the mandates of federal and civil rights law.

---

11 *See* 28 C.F.R. § 36.302 (c) ("Generally, a public accommodation shall modify policies, practices, or procedures to permit the use of a service animal by an individual with a disability.").

78. Ms. Brenner sues over Defendant's active and continuous violation of federal civil rights law, and active and continuous failure to reasonably accommodate E.B.

## **CLAIM 1: VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT**

46. MS. BRENNER repeats and realleges all preceding paragraphs in support of this claim.

47. At all times relevant to this action, the Americans with Disabilities Act, 43 U.S.C. § 12181, *et. seq*. has been in full force and effect and has applied to Defendant's conduct.

56. Defendant owns and operates a public of public accommodation.

57. By failing to permit E.B. to attend private school with her service animal, Defendant failed to make a reasonable modification.

58. By failing to permit E.B. to attend private school with her service animal, Defendant violated the ADA regulations which expressly require that places of public accommodation permit an individual to bring their service animal.

59. By failing to permit E.B. to attend private school with her service animal, Defendant failed to provide E.B. with an equal opportunity to participate to the same degree as non-disabled students.

60. To remedy Defendant's ongoing and continuous discriminatory conduct, MS. BRENNER is entitled to seek and recover injunctive relief.

61. MS. BRENNER has retained the undersigned counsel and is entitled to recover reasonable attorneys' fees, costs, and litigation expenses from the DEFENDANT pursuant to 42 U.S.C. § 12205.

## **CLAIM 2: VIOLATIONS OF SECTION 1557 OF THE PATIENT PROTECTION AND AFFORDABLE CARE ACT**

62. MS. BRENNER repeats and reiterates every allegation set forth in the foregoing

paragraphs of this Complaint with the same force and effect as if more fully set forth at length herein.

63. At all times relevant to this action, the Louisiana Commission on Human Rights, LA. REV. STAT. ANN. § 51:2231 et. seq., (hereafter "LCHR") has been in full force and effect and has applied the conduct of DEFENDANT.

64. At all times relevant to this action, E.B. has experienced substantial limitation to her major life activities, as alleged above; accordingly, E.B. has been an individual with a disability within the meaning of the Louisiana Commission on Human Rights, LA. REV. STAT. ANN. § 51:2232(3)(a).

65. At all times relevant to this action, DEFENDANT has qualified as places of public accommodation defined by LA. REV. STAT. ANN. § 51:2232(9) by virtue of either supplying services to the general public, soliciting and accepting the patronage of the general public, or having been supported directly or indirectly by government funds.

66. The LCHR prohibits discriminatory practices and provides that "it is a discriminatory practice for a person to deny an individual the full and equal enjoyment of goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation, resort, or amusement . . . on the grounds of . . . disability." LA. REV. STAT. ANN. § 51:2247.

67. The LCHR extends relief to "any person deeming himself injured by" discrimination in violation thereof. LA. REV. STAT. ANN. § 51:2264.

68. Defendant discriminated against E.B., on the basis of disability, in violation of LA. REV. STAT. ANN. § 51:2247, by denying her the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations by prohibiting her from attending

private school with her service animal. For the same reasons that Defendant violated the ADA, Defendant violated the LCHR.

69. Defendant's employee discriminated against E.B. by excluding her from and denying her the benefits of the Defendant's program or activity. Defendant's employee and contractor excluded, denied benefits to, and otherwise subjected E.B. to discrimination, on the basis of her status as a person with a disability with a service animal, by refusing to let E.B. enter the school with her service animal.

70. Defendant's employee was aware of the fact that E.B.'s dog was a service animal, as Ms. Brenner had clearly communicated the dog's role to Defendant.

71. Ms. Brenner deems E.B. injured by the DEFENDANT'S discrimination and brings suit under the LCHR to recover compensatory damages for the injuries and loss E.B. sustained as a result of Defendants' discriminatory conduct and intentional discrimination herein.

72. By and through the factual narrative outlined above, Defendant was intentional in discriminating against E.B.

73. By and through the factual narrative outlined above, Defendant's failure to accommodate was not as a result of a simple oversight or failure to appreciate the nuance of a technical building code. Instead, Defendant's failure to accommodate E.B. was a purposeful decision.

74. Ms. Brenner prays for a recovery of compensatory / actual damages sustained by E.B. through the date of trial.

75. In addition to compensatory damages, Ms. Brenner prays for and seeks nominal damages. It is Ms. Brenner's position that an award of nominal damages would confer significant

civil rights to the public, as a judgment in his favor against Defendant, regardless of the amount, would deter educational entities from discriminating against disabled individuals in the future, would lead to change to Defendant's policies / practices, and would spark public discussion on the need to accommodate individuals with disabilities.

76. Ms. Brenner is further entitled to injunctive relief, as well as an award of attorneys' fees, costs, and disbursements pursuant to the LCHR. LA. REV. STAT. ANN. § 51:2264.

### CLAIM 3: VIOLATIONS OF THE LOUISIANA STATUTES ON THE RIGHTS OF PERSONS WITH DISABILITIES

77. MS. BRENNER repeats and reiterates every allegation set forth in the foregoing paragraphs of this Complaint with the same force and effect as if more fully set forth at length herein.

78. At all times relevant to this action, the Louisiana Statutes on the Rights of Persons with Disabilities, La. R.S. § 46:1951 *et seq.* ("LSRPD"), was in full force and effect and applied to DEFENDANT's conduct.

79. LSRPD states, "Every person with a disability shall be entitled to full and equal accommodations, advantages, facilities, and privileges in … (3) places of public accommodation." Moreover, "Every person with a disability may be accompanied by a service dog, especially trained to aid such person, in any of the places" articulated therein, including places of public accommodation. La. R.S. § 46:1953(B)(3) and (C).

80. At all times relevant to this action, the LSRPD, at La. R.S. § 46:1952(3), incorporated the definition of disability in the Rehabilitation Act, 29 U.S.C. § 705(9).

81. At all times relevant to this action, E.B. had substantial limitations to her major life activities, as detailed above, within the meaning of the LSRPD, La. R.S. § 46:1952(3).

82. At all times relevant to this action, DEFENDANT was a place of public accommodation within the meaning of the LSRPD.

83. A "Violation of Rights" pursuant to the LSRPD includes "any … agent … or employee of any … corporation who withholds, denies, deprives …; [or] intimidates … a person with a disability … for exercising his right to be admitted to or enjoy the places and facilities provided in this Chapter; or otherwise interferes with the rights of a person with a disability under this Chapter …" La. R.S. § 46:1956(A).

84. Defendant's employee and agent withheld, denied, or otherwise deprived E.B. access to its private school after Ms. Brenner attempted exercised her right to enroll in the school as a person with a disability, accompanied by her service dog.

85. For the same reasons that Defendant violated the ADA, Defendant violated the LSRPD.

86. The LSRPD provides for the payment of actual damages for any economic loss to any person with a disability whose rights are violated pursuant to the statute. La. R.S. § 46:1956(C).

87. Due to the Defendant's discriminatory treatment of E.B. and/or failure to accommodate, E.B. suffered damages, as outlined above.

88. Ms. Brenner seeks recovery of actual damages for all economic loss to E.B. through the date of trial, pursuant to La. R.S. § 46:1956(C).

89. In addition to compensatory damages, Ms. Brenner prays for and seeks nominal damages. It is Ms. Brenner's position that an award of nominal damages would confer significant civil rights to the public, as a judgment in his favor against Defendant, regardless of the amount, would deter educational entities from discriminating against disabled individuals in the future, would lead to change to Defendant's policies / practices, and would spark

public discussion on the need to accommodate individuals with disabilities.

90. Ms. Brenner further prays that injunctive relief, as well as an award of attorneys' fees and costs, be awarded under the LSRPD.

WHEREFORE, MS. BRENNER demands judgment against DEFENDANT, and requests the following injunctive relief, compensatory damages, nominal damages, and attorneys' fees and costs:

A. Enter permanent and/or preliminary an injunctive relief pursuant to the ADA, LCHR, LSRPD. The full scope of requested injunctive relief is to be determined as the case proceeds, but Plaintiff's initial request is as follows:

   i. That E.B. be permitted to attend Southfield with her service animal and any replacement service animal(s);

   ii. That Defendant be ordered to develop policies/procedures concerning the admission of students with service animals;

   iii. That Defendant be ordered to develop policies/procedures concerning not making unreasonable inquiries concerning service animals; and

   iv. That Defendant be ordered to submit its staff to training on the requirements of the ADA.

B. Award to MS. BRENNER:

   i. Compensatory / actual damages for any loss pursuant to the LCHR and LSRPD;

   ii. Nominal damages pursuant to the LCHR and LSRPD;

   iii. Reasonable costs and attorneys' fees pursuant to the ADA, LCHR and

    LSRPD;

  iv. Interest on all amounts at the highest rates and from the earliest dates allowed by law;

  v. Any and all other relief that this Court finds necessary and appropriate.

B. That this Court award such other and further relief as it deems necessary, just and proper.

## DEMAND FOR JURY TRIAL

MS. BRENNER demands trial by jury on the issues of (1) the injuries E.B. suffered as a result of DEFENDANT's discriminatory conduct; and (2) the quantum of damages that should be awarded.

Dated: September 17, 2020

            Respectfully Submitted,

            By:/s/ Garret S. DeReus

            BIZER & DEREUS, LLC
            Andrew D. Bizer (LA # 30396)
            andrew@bizerlaw.com
            Garret S. DeReus (LA # 35105)
            gdereus@bizerlaw.com
            Emily A. Westermeier (LA # 36294)
            ewest@bizerlaw.com
            3319 St. Claude Ave.
            New Orleans, LA 70117
            T: 504-619-9999; F: 504-948-9996

            LAW OFFICE OF WILLIAM MOST, LLC
            William Most (LA # 36914)
            williammost@gmail.com
            201 St. Charles Ave., Ste. 114 #101
            New Orleans, LA 70170
            T: 650- 465-5023